## No. 156.

### LEROY TEMPLEMAN VS. HAMILTON & CO. ET AL.

Where a note with the mortgage securing the same are assigned by notarial act "without recourse," the latter words amount to a mere stipulation of non-warranty; and their effect, so far as the mortgage is concerned, is governed by the Civil Code and not by the Law Merchant.

Templeman vs. Hamilton & Co. et al.

Mere knowledge of attorney at law, not derived in his capacity as attorney of plaintiff but from his attorneyship for another party, is not binding as notice to plaintiff.

The assignor of an incorporeal right, even under stipulation of non-warranty, warrants the existence, not only of the right, but of the mortgage or other accessary securities attached to and transferred with it.

When a mortgage thus transferred turns out not to have existed as to a part of the land covered by it, remaining good as to the rest, the transferror is bound under the warranty to make good only the loss from such eviction.

If the remaining security is sufficient to make good the debt, and if it is lost or impaired only through the act, negligence or fault of the transferree, he loses his recourse on the transferror on account of the eviction.

APPEAL from the First District Court, Parish of Caddo. *Taylor*, J.

*Watkins & Watkins* and *T. F. Bell* for Plaintiff and Appellant:

*Where the sum of money paid and promised for property is given with some other thing of much less value the contract is a sale. It is not an exchange or a giving in payment.* Suc. Furniss, 34 Ann. 1015; Ward vs. Levy, 32 Ann. 786; Jenkins vs. Caddo, 7 Ann. 559.

Vendor transferred a judgment in solido versus four persons—one proved he was not bound. A suit in warranty was sustained for a partial eviction one-fourth. 2 Ann. 880.

He who sells a debt or in corporal right without recourse warrants its existence. If vendee is evicted in part he can sue in warranty for the value of the evicted part without suing for rescission. Such is the case where vendor is in part evicted from a mortgage transferred. 2 Ann. 880.

Troplong Vente, volume 2, No. 993, The warranty is that the debt existed and the mortgage security existed though the words without recourse is used. This relieves transferror rom warranting the solvency of the debtor only. 2 Ann. 880; 7 Ann. 559; R. C. C. 2504 and 2646 and 7 Ann. 268 and 13 Ann. 229.

Vendee or transferree evicted of part may sue vendor in warranty for the value of the evicted part. R. C. C. 2511 and 2500; 13 Ann. 145; 6 R. 506; 2 Ann. 880; 7 Ann. 559– 268; 13 Ann. 229, 145; 13 Ann. 501; 6 Ann. 304; 6 N. S. 523; as to part evicted, R. C. C. 2500, 2501, 3 Ann. 326; 7 L. 50; 5 Ann. 276; 15 Ann. 424; 3 L. 396; 14 Ann 716. If the property sold is no longer in existence no suit for rescission will lie *res perit domino* 3 L. 397.

If the thing sold has been impaired in value by the vendee by his neglect the vendor on eviction is bound for the restoration of the full price. R. C. C. 2507 (2483) and Daiquin vs. Coiron, 3 L. 396.

The only prescription would be ten years. An act in warranty is to enforce a personal obli. gation Commencing from eviction in July, 1876, which has not elapsed. 7 Ann. 562; 2 Ann. 144; 7 L. 470; 11 R. 403; 13 Ann. 145; 17 Ann. 42; R. C. C. 3544.

*Alexander & Blanchard* for Defendants and Appellees :

1. Under the state of facts shown by this record, if the plaintiff ever had any claim against defendants, his proper remedy was to sue to rescind the sale for non-payment of price. 7 Ann. 201; 10 Ann. 23. See also 7 Ann. 268, 559.

The right to bring such suit to enforce the resultory condition is prescribed by ten years. 1 Ann. 440; 11 Ann. 654; 16 Ann. 129.

This time commences to run from the date of the maturity of the last note. 28 Ann. 598; 34 Ann. 989.

Templeman vs. Hamilton & Co. et al.

In this case more than *twelve years* elapsed from the maturity of the notes till the filing of this suit

2. The notes transferred by defendants to plaintiff were negotiable promissory notes, coming strictly under the law merchant, and having been transferred "without recourse," under the settled rules of the commercial law, defendants were released from any liability therefor.

That these notes were secured by mortgage does not restrict their negotiability, nor take them from under the *lex mercatoria.* 3 L. 241; 7 L. 571; 16 L. 207; 6 R. 62; 8 Ann. 457; 11 Ann. 664; 27 Ann. 561.

The Civil Code was not intended to embrace, nor does it apply to the commercial law. This was contained in the "Commercial Code," compiled, but never adopted. This branch of our law is controlled by the law merchant which prevails throughout the United States. H. D. Title Laws, vii., p. 795.

In case of conflict between the rules of commercial law and the articles of the Code the latter is to be disregarded, and the former prevails. 2 R. 120; 4 Ann. 210.

The article of the Civil Code relating to the assignment of credits and incorporeal rights does not apply to the transfer of negotiable notes or drafts. 7 Ann. 561.

3. At the time of the transfer of the notes, without warranty, the suit was pending by which Gilmer was evicted from a part of the mortgaged lands. The same attorney who represented Gilmer in that suit represented and advised plaintiff in the sale of the oil mill property and the transfer of the notes and mortgage. The plaintiff thus had knowledge of the danger of eviction and purchased at his peril.

Knowledge of *the agent is knowledge of the principal, and knowledge of the attorney is knowledge of the client.* 2 Ann. 316; 14 Ann. 711. Weeks on attorneys-at-law. Sec. 237 and note, p. 408.

It is not necessary that the act itself should recite that plaintiff acquired the notes at his risk and peril. "Having knowledge of the danger of eviction, he is held by implication from those facts, to have purchased at his risk and peril. 34 Ann. 648.

4. Warranty is essentially in the nature of a suretyship. If defendants were bound to plaintiff in any way, their obligation to him was, that in event Gilmer failed to pay the notes, and the mortgaged property proved deficient, they would pay the Gilmer debt, to the amount of the notes, and look to Gilmer for reimbursement.

The surety is discharged by an extension of time granted to the debtor, and also when by the act of the creditor, the subrogation to his rights, privileges and mortgages can no longer be operated in favor of the surety. C. C. 3061, 3063; 1 Ann. 254; 1 R. 212, 301 15 Ann. 522; 16 Ann. 357; 32 Ann. 497.

The form of the obligation is not material. 15 Ann. 522.

" Where two persons are bound by the same contract to a third for the same debt, and when one of these obligors has upon payment of the debt, a right of subrogation thereto, and of recourse for the amount paid upon his co-obligor, any contract between the creditor and the ultimate debtor whereby delay is granted or securities are surrendered or diminished will discharge the obligor entitled to such recourse and obligation, unless his consent be obtained." 32 Ann. 497.

The fact of the debtor's insolvency does not affect the question of the surety's discharge. 3 R. 299.

Plaintiff not only granted extensions of time to Gilmer, but also by his various acts and agreements placed it out of his power to subrogate defendant to his rights, mortgages, etc.

5. Plaintiff has suffered *no loss;* on the contrary, has been *benefited to the full amount of the notes.* He transferred them to Cash as collateral security for a sum almost equal to the

full face value. No part of this debt was ever paid back by him to Cash, but Cash took the land upon which the Hamilton mortgage rested, and released plaintiff from his debt.

The opinion of the Court was delivered by

FENNER, J.   The following are the pertinent facts:

On August 9, 1872, Templeman, who was half-owner with Hamilton & Co. of an oil mill and lots on which it was located in Shreveport, sold his said interest to the latter for $35,000.   As part of the price, Hamilton & Co. transferred to Templeman two notes of Gilmer for $9970 11, running to maturity and secured by a mortgage on a plantation of Gilmer in Bossier parish comprising 1623 acres of land.   In connection with the act of sale, and for the purpose of giving Templeman an authentic title, Hamilton & Co. executed a notarial act of assignment and transfer of the notes and mortgage to Templeman, which contains the following stipulation: " The said Hamilton & Co. hereby subrogates the said Templeman to all the rights, privileges and actions which they have in or to the said mortgage, but it is specially agreed and understood that this transfer is made without recourse on said Hamilton & Co."

After maturity of the notes, Templeman brought suit upon them, and on March 30, 1876, recovered judgment against Gilmer with recognition of the special mortgage on the land.

Prior to these transactions, and even before the execution of Gilmer's mortgage, there had been pending a suit by H. A. Jones et al. against Gilmer, claiming title to 480 acres of the lands mortgaged.

It appears that neither Hamilton & Co. nor Templeman had personal knowledge of the pendency of this suit; but Templeman himself testifies that L. M. Nutt, Esq. acted as his attorney in the transaction between himself and Hamilton & Co. about the transfer of these notes, and Nutt was the attorney of Gilmer in the suit of Jones et al. against him and therefore necessarily knew of its pendency.

In 1874, judgment had been rendered in the district court rejecting Jones' demand, but in July, 1876, that judgment was reversed by this Court, and Gilmer was evicted from 480 acres of the land covered by the mortgage.

Although Templeman had knowledge of this eviction, he proceeded to the execution of his judgment upon the remaining 1143 acres of land, without making any demand upon Hamilton & Co. on account thereof and without even notifying them of the fact of eviction.   Indeed, it does not appear that Hamilton & Co. ever acquired knowledge of any claim of Templeman against them, or even of the fact of evic-

tion, until the present suit was instituted in May, 1885, nearly eight years after the remaining land had been sold in execution of the mortgage. After this eviction, the remaining 1143 acres of land stood subject to three mortgages:

1st. That of Lydia Wilson, owned by P. R. Cash.

2d. That of P. B. Cash.

3d. That of Templeman.

The three amounted in the aggregate to between $20,000 and $22,000.

The testimony in the record is unequivocal and unanimous (including that of Templeman himself) that the 1143 acres were worth fully thirty-five dollars per acre, or nearly double the entire mortgages resting upon it.

There then ensued a series of agreements between Templeman, Cash & Gilmer, as follows:

1st. On April 28, 1877, Templeman executed an assignment and transfer of his judgment and mortgage to Cash, as collateral security for a debt of $9,126 23, due the latter, with a separate agreement, however, that Templeman should, nevertheless, execute the judgment in his own name, reserving to Cash the right to claim the proceeds, and, accordingly, Templeman issued his *fi. fa.* and caused the 1143 acres to be seized and advertised for sale on September 1, 1877.

2d. On August 11, 1877, Cash and Gilmer enter into an agreement by which Cash obligated himself to buy in the property at the sale, provided it did not sell for more than the amount of the three mortgages, and agreed, in the event of such purchase, to let Gilmer remain on the place and cultivate it, and to redeem it by paying $2,600 on account of the Templeman mortgage on 1st December, 1877, and the balance in installments, the last falling due in five years, with the condition that, on failure to pay any installment when due, his right to redeem should be forfeited and he should surrender the place.

3d. Templeman, though not a party on the face of the foregoing agreement, took cognizance of it by an agreement entered into between him and Cash on the same day, under which Cash again expressly obligated himself to buy in the property, provided it did not sell for more than the amount of three mortgages; and it was further agreed that, in case of failure in any of the payments stipulated as above to be made by Gilmer, Cash should convey the property to Templeman for the amount due him on the three mortgages, and give him four years time to pay it in.

These agreements all took effect. The sale was made without appraisement, as stipulated in the mortgage. Cash, instead of bidding the amount of the three mortgages, as he might have been required to do under his agreement, was permitted to buy it in at the price of $12,706 66, barely sufficient to pay costs, taxes and the two prior mortgages, leaving but a trifle to go to the Templeman mortgage.

Gilmer remained in possession, but failed to make the first payment of $2,600 as agreed. Thereupon he was dispossessed, and in January, 1878, Cash sold to Templeman, for the nominal price of $15,883 24, but with an additional mortgage for $6,221 62, granted by Templeman to Cash the same day, making an aggregate price of $22,104 86, payable in four years as agreed. Templeman failing to pay the first installment, Cash made judicial foreclosure, which was merely formal, however, because made under another agreement that Cash should buy it in, and, at whatever price, that he should relieve Templeman from the entire indebtedness, as well as from an additional debt of $1,000 and interest due by him to Cash on a different account, which agreement was fully executed.

So this matter was finally settled in 1879, and yet no demand was made on Hamilton & Co. until 1885, six years afterward.

He now sues Hamilton & Co. for the amount of the two mortgage notes transferred to him, or $9,970 11, with 8 per cent. interest from 1873, aggregating nearly $20,000, on the grounds that the 1143 acres validly mortgaged yielded nothing toward their satisfaction, and that Hamilton & Co. were bound as warrantors of the mortgage on the 480 acres, which, if existing, would be sufficient to satisfy the entire debt.

Let us now consider what is the law applicable to the facts thus elaborately detailed:

1st. We consider the words in the transfer, "without recourse on Hamilton & Co.," as amounting to nothing more than a stipulation of non-warranty, and that its effect in such an assignment as that here made, so far as the mortgage is concerned, is governed by the provisions of our Civil Code and not by the Commercial Law.

2d. We do not consider the knowledge of Nutt, attorney, of the pendency of Jones' suit, as the knowledge of Templeman, in such manner as to convey to the latter notice of the danger of eviction, and thus to make him a purchaser "at his risk and peril" under art. 2505, C. C., as expounded in R. R. Co. vs. Jourdain's Heirs, 34 Ann. 650.

No notice, express or implied, was conveyed to Nutt in his capacity as attorney of Templeman. What knowledge he had was derived by

him entirely outside of this transaction and in his capacity as attorney of Gilmer in that suit. For aught that appears, it may have been his duty to Gilmer not to speak of it to these parties. At all events, there was no notice to Templeman or to his attorney as such.

3d. It is no longer an open question in our jurisprudence that the assignor of an incorporeal right, even without warranty, guarantees. not only the existence of the right under the express terms of art. —r C. C., but also the existence of the accessory securities attached to and transferred with it.

Troplong says: "When a credit secured by mortgage is sold, it is: not sufficient that the credit should exist, it is necessary that the mortgage should be entire at the time of the contract. If a part of the property was, at that time, freed from the mortgage, the transferror would be bound to guarantee the transferree, who thus fails to find all the securities on which he counted, the absence of which may endanger the capital which is due to him." *Vente* § 933.

This proposition has been several times quoted and applied by this Court in cases of assignments without recourse. Toler vs. Swayze, 2 Ann. 880; Corcoran vs. Riddell, 7 Ann. 268; Jenkins vs. Caddo, id· 559; Bienvenu vs. Bank, 6 Ann. 524; Rutherford vs. Hennen, 13 Ann. 336.

It follows that, as the 480 acres here involved, did not belong to the mortgagor at the time of the mortgage, the latter did not exist at 'the date of transfer, and Hamilton & Co., were bound to warrant the transferree.

4th. But, this being determined, the question remains : what were the nature and extent of the warranty ? Counsel for plaintiff strenuously contends that it is absolute and unconditional; that Templeman became the perfect owner of the entire mortgage with right of use and abuse; that he could have done what he pleased with the valid mortgage on 1143 acres; that he might have abandoned or remitted it,. or given it away; and that he would still have retained the right to require Hamilton & Co., to respond for the value of the 480 acres,. under their warranty of the existence of the mortgage thereon.

This contention has not the slightest foundation in law, reason or justice.

The whole object and effect of the mortgage were to secure payment of the principal debt due on the notes. If, notwithstanding the eviction from the 480 acres, the remaining valid mortgage on the 1143 acres was a sufficient security for the debt, then the eviction occasioned Templeman no loss and ground of action against Hamilton & Co.

The gist of his action is, not simply the eviction, but that, *thereby*, he lost his debt. If the remaining security, in itself sufficient, was. rendered insufficient only by the acts, negligence or fault of Templeman, he would lose his recourse against Hamilton & Co. The latter's. warranty partook of the nature of suretyship, and bound them to respond only in case the remaining valid mortgage, properly administered. and enforced, should fail to satisfy the debt.

These views are so conformable to reason as hardly to require the support of authority, but the highest authority is not wanting to sustain them, arising on a case entirely analogous, to wit: where the transferror of a debt secured by mortgage had warranted the continuing solvency of the debtor. In discussing the right of the transferree to enforce this warranty, Troplong says: "It is essential that the insolvency should not have been occasioned by the act of the transferree. If, for example, the transferree has gratuitously released the mortgages which secured the debt, if he has consented to release some of the sureties or one of the solidary debtors, he will not be heard to complain that the debt has become bad, because it is himself who has caused it. *Alteri per alterum iniqua conditio inferri non debet.*" Troplong, *vente*, No. 940.

He then proceeds to show that a like result attaches when the securities have been lost or impaired through the mere negligence of the transferree. No. 941 *et seq*.

Marcadé propounds the same doctrine, saying: "It is evident that. the conventional warranty will not be due, if it was by the act of the transferree or merely by his negligence, that the debts or the securities. accompanying them have been lost." 6 Marcadé, p. 343. See also: 3. Delvincourt, p. 263, No. 6; 12 Duranton, p. 289, No. 171.

Applying these principles to the facts heretofore minutely detailed,. let us inquire through whose fault it was that the 1143 acres remaining validly mortgaged, and shown by all the testimony to be worth nearly double the entire mortgages resting on them, failed to satisfy Templeman's debt.

When Templeman learned the fact of Gilmer's eviction from the 480 acres, it was his plain duty to have immediately informed Hamilton & Co. thereof. His proper course was then and there to have demanded of Hamilton & Co. a rescission of the transfer and payment. of the amount due on the notes, with return thereof and of the mortgage as it stood. If Hamilton & Co. had refused, he might either have enforced his demand by action or might have proceeded to fore-

·close the mortgage, holding them responsible for any resulting defi-
·ciency. This would have given Hamilton & Co. the opportunity of
protecting themselves, and it is self-evident that they could and would
have done so without incurring any loss. We gravely doubt whether
in electing to proceed without such notice to Hamilton, thus
placing it out of his power to restore the *status quo* under a rescission,
and depriving Hamilton & Co. of the power of protecting themselves
in any way, Templeman did not waive and destroy his right of re-
·course upon them.

But, even passing this by, it is at least clear that, in proceeding as
he did without notice to Hamilton, he incurred the highest duty to act
in strict conformity to law and to do all in his power to make the
property bring its full value.

Now, a review of the agreements between Templeman, Gilmer &
·Cash, already fully detailed, shows that Cash, who controlled all the
mortgages, was willing and had obligated himself to bid for the prop-
·erty up to their entire amount. Under those agreements, it was per-
·fectly immaterial to Cash whether he bought the property at $12,000,
·or at the amount of all the mortgages. In any event, he was to make
and did make, the same settlement with Gilmer; and, in case of Gil-
mer's failure to comply, with Templeman. It is apparent that Tem-
pleman had it in his power to make the property bring enough to pay
his mortgage, and, even without forcing the bidding, there is no reason
·to doubt that Cash would, on mere request, have bid the necessary
·amount, because there was no motive for him to refuse. It was to the
interest of nobody but Templeman that Cash's bid should be a small
one, because he got all the advantage under his agreement which
would have accrued from a larger bid, and, at the same time, laid the
foundation for this enormous claim against Hamilton & Co. A sale
made under such agreements has no claim to the effect of a judicial
sale in fixing the value of the property.

We have, heretofore, had before us this very sale as affected by the
agreement between Cash and Gilmer, and we then held that its effect
was to give to the execution sale the force and effect of a voluntary
sale. Gilmer v. O'Neal, 32 Ann., 983.

Templeman was privy to that agreement, and this fact, together
with his own similar agreement, attach the same character to the sale
with regard to him.

It follows that his claim, that this sale must be taken as the meas-
·ure of the value of the property and as fixing the deficiency for which

Martin vs. Sheriff et al.

the defendants are bound, is untenable. Regarded as a conventional sale, it could not have that effect.

The evidence in the case establishes, as we have seen, that the land was worth much more than enough to satisfy all the mortgages on it, and hence there is no ground for the claim herein.

We might present other considerations showing that Templeman has actually realized in execution of his various agreements with Cash an amount very nearly equal to the whole amount of his claim, as the direct result of his ownership thereof.

Certainly, if the eviction had never taken place, and if the 480 acres had been exposed for sale at the same time with the 1143 acres, independent of these agreements, and had brought only the same relative price, he would have been in no better position than he is to-day, under the effect of his agreements with Cash, for he would still have left a considerable deficiency due on his mortgage, for which there would have been no claim on Hamilton & Co.

From every point of view, the plaintiff's case seems to us to be entirely without merit. The claim is either an after-thought or a device to profit at the expense of Hamilton, and, in either view, it does not commend itself to favor.

Judgment affirmed.